All right, moving to the last case on the calendar for argument this morning, United States of America v. James Michael Wells. We do not have any of the trial counsel here today, do we? We do, Your Honor. I believe Brian Schroeder is here, and Rich Kertner and Peter Offenbecker are also in the audience. May it please the Court, Davina Chan on behalf of Jim Wells, I'd like to try to reserve five minutes for rebuttal. The government did not and does not know who committed this crime. The evidence they tried to use to connect Jim Wells to this crime was weak. The perpetrator stood directly over his victims and shot them, but there was absolutely no physical evidence. No blood, no tissue, no gunshot residue connecting Jim Wells to this crime. Under the government's theory, Jim Wells supposedly drove into and out of the com state right during a shift change. But none of the witnesses who testified at trial who were coming and going during that precise time saw him. On appeal, the government doesn't even argue that its evidence was overwhelming. Instead, they argue their theory was the only conclusion consistent with the strands of evidence they elected to emphasize. But rather than present their weak case to a jury and allow it to reach an honest conclusion, the government overreached at every turn. This appeal raises eight instances of such overreach. With the Court's permission, I plan to focus today on the profile and character evidence. In its opening statement, the government told the jury Mr. Wells had a history of running things himself, that people who supervised him would testify that he liked to be in charge and have things done his way. The government told the jury that it would hear Jim Wells had a very high regard for his own knowledge. And the government told the jury that a forensic psychologist would come and talk about targeted personal planned violence in the workplace and that they would decide whether this testimony fit exactly what happened here. This opening was consistent with the notice that the government had given months before trial that it would call an expert to testify about the personality and psychological characteristics of individuals who commit this type of crime. It was consistent with the government's explanation at both the expert hearing and the final pretrial conference that the way this would proceed would be the witnesses would testify as to what kind of person Jim Wells was, the expert would testify as to what kind of characteristics someone who would commit this crime would have, and the jury would determine whether this was a match. And the government followed through on its promise. It presented character testimony that Mr. Wells was conceited and prideful and liked to have things done his way. It presented Malloy's testimony that this type of crime would likely be committed by someone with those characteristics. And in arguing and closing, they described this as fitting Mr. Wells to a T. The government's argument that Wells somehow opens the door to character evidence mischaracterizes both the law and the facts of this case. I don't think it was an opening the door situation, because this was, or I'm inclined to this view. We haven't talked about the case, of course, among the panel, but this was a situation where there was discussion pretrial and by way of emotional limine as well as to expertise and the scope of what the expert would testify to. Now, the government did argue in connection with Dr. Malloy's testimony that there was a forfeiture waiver after some arguments. Can you clarify that? Because I don't think there was an objection to the government's proffer of Dr. Malloy as a workplace violence expert, but there were discussions on the inappropriateness of profile evidence. So how do we view the forfeiture waiver arguments provided? I don't believe that anything was forfeited in this case. I think that there were many, many pretrial motions that were filed with respect to Dr. Malloy. And then on the very specific question that I'm raising on appeal, there was a very specific objection where Peter Offenbecker rejoined the case. One week after he rejoined the case, there was a final pretrial conference, and what he objected to, and I don't want to get the words wrong, so I'm looking for my pages on... I mean, I think there were sufficient objections raised with regard to the nature of profile evidence, but am I correct then in understanding the defense position as it's okay to call Dr. Malloy as an expert on workplace violence, general workplace violence issues, but not okay to testify to the profile type of testimony that Dr. Malloy did in this particular case? Is that a correct summary of your position? Clearly both objections were raised at trial. The objection that I'm emphasizing... There was a continuing objection throughout, was it not? So he has the appropriate expertise, but that expertise has no relevance to the facts of the case. He has expertise in something. That's true. He has expertise in something. His expertise is when there's a mass murder and three people are shot in one place and the perpetrator is caught. That means he is either killed at the scene, commits suicide, or is caught. If you examine those people, they have certain characteristics. That's what he has expertise in. He doesn't have expertise in this type of murder where the perpetrator is not caught, where the identity of the perpetrator is unknown. Even if he did, the way he presented the testimony was totally inappropriate. When you say he doesn't have that type of expertise, what's the basis of your argument? Some other expert testified that there are two different fields of study, or what? Yes. All of his studies involve what's called mass murder. And he defines it, for the purposes of his study, as where three people are killed at one place at one time by one perpetrator. But that's not the main issue that I want to raise. That's just an issue as to whether he has expertise in this kind of murder. The main issue I want to raise is the manner in which he presented his expertise. Peter Offenbecker very clearly objected to having a profile expert come in and say, the person who committed this crime probably had characteristics X, Y, and Z, and then have a bunch of lay witnesses come in and say he had, in fact, characteristics X, Y, and Z. Even if you had to reach to a ten-year-old tent question to plug in one of the profiles, right? Yes, that's correct. And that's exactly what happened in this trial, because when there was an objection to that testimony, the government said, this goes directly to the character that we're going to be discussing throughout this trial. In closing arguments, they pointed specifically to that incident and said, this was the most concrete example that he was an egotistical narcissist. And that is what Dr. Malloy said would be the characteristic of someone who would commit this crime. And this was a ten-year-old refusal to do something about a tent, right? Yes, it was a ten-year-old incident about a hut being transported to Attu Island, and whether or not it should be brought back to the rigger shop, or whether it should be left at Attu Island for a transformer to be installed on it. And they brought this in, arguably as... I have to tell you I'm not exactly sure what the rationale as to what this was technically admitted under, but it was clearly admitted for the purpose of showing that my client is a narcissist. And you know what? A lot of people are narcissists. Some people think I'm a narcissist. That doesn't make me a murderer. And it's totally inadmissible in a court of law. I want to give you a chance to also address whether in this particular case, if we agree with you that it was error to admit this sort of profile evidence, whether the other pieces of circumstantial evidence would be sufficient such that the error can be found harmless. You've got the missing gun testimony from the friend. You've got the fact that his alibi was debunked by the forensic expert. You've got surveillance of a car that matches the SUV belonging to his wife. And then you've got the fact that it's very likely an insider job with a road taken by the murderer that very few people would know about. How do we look at the remaining evidence in reaching the determination of harmlessness? Well, first of all, the government didn't even argue that this error was harmless. They argued it in one sentence in the 28J letter, and this Court has found that issues raised in the 28J letter are ways. And the reason the government didn't argue harmlessness is because this error is not harmless. The standard of view on harmlessness is that the government bears the burden. It's not whether or not the remaining evidence would be sufficient, and I argue that it would not be sufficient. The standard of view on harmlessness is whether the government can prove that not even one juror was affected by Dr. Malloy's testimony. Is there any question that what they did was violate 404A? No. No question. And without Malloy's testimony, character evidence, there was no motive in this case. Theory, the government's theory of motive made no sense. Which kind of gets me to another thing that really disturbed me, was the excited utterance. When the Coast Guard guy went to interview the new widow, and there was this evidence that was objected to that she, let's see. Did she blurt out a name? Yes. What was that name? Jim Wells. And with that, it stopped. That's what the jury stopped hearing. No one knew until later, or at least it wasn't addressed, that the next line was, oh, Jim wouldn't hurt Rich. What's the relevance of the excited utterance if it's complete? There was no relevance of the excited utterance at all. Well, I guess I'm really preparing the government here. And she didn't blurt out a name either. That's the other thing. She didn't blurt out a name. They asked a specific question, and she gave a specific answer, which was he had problems with one person, and that person wouldn't hurt Jim. Well, it seems to me, from the very beginning, the government's loading up the scales here. First place, they jumped into an Article III question on the two lawyer representation, and on their own motion, when it's none of their business, they try and remove the second lawyer. I'm going to be interested in the government's explanation for that. Do you have an explanation for it? I think that they were worried about their case, and they wanted to weaken the defense's case. I mean, if they were so sure about their evidence, they wouldn't have overreached in all the ways that I've pointed out in this brief. I understand that this was a terrible crime, and I understand that the government wanted to get a conviction, but this is no way to get a conviction. But that isn't what the government does. The government looks for justice. It doesn't look for a conviction. I agree. Is it fair to say that the 404B evidence and Dr. Molloy's testimony essentially was the centerpiece of the government's case, that that was the evidence around which the government built the case? I believe it was the centerpiece, and one of the main reasons I believe it was the centerpiece is every other piece of evidence that the government had, they had for 10 months. The reason why they didn't go and arrest Jim Wells is because they didn't have enough evidence. They couldn't understand why he would do this crime. And so they brought in Mr. Molloy to explain why an illogical crime would be committed. An illogical crime would be committed because somebody has this kind of personality. And if you have this kind of personality, it's logical to you. So yes, the government opened with it. As the government lawyer states in the middle of SQ's testimony, this is the character that we're going to be discussing throughout this case. It closed on it. In its rebuttal it describes the profile as fitting Jim Wells to a T. The court raised, you mentioned one, two, three, four other pieces of evidence. One of them was a gun that was a .44 caliber Smith & Wesson, so he may have had access to a .44 caliber Smith & Wesson 15 years ago. We're talking about Kodiak, Alaska. That would not eliminate a single household on that island. You talked about the car, the SUV, which what we understand is that you can't tell what kind of car that is. And although the government says that it must have been that car, it ignores the fact that any car coming from the other direction, from Antelmartian Bay, would not be captured on any video. You also mentioned that the car took a road that was not well known. If you come from Antelmartian Bay, that is the driveway that you would take to get into the Comstay. So it's not that it's very well known, it's just that if you come from the other direction, that's the one you take. And then the court mentioned the alibi and that it was, quote, debunked. It was debunked only because the government seized the alibi evidence and then did destructive testing. It's unrebutted that Mr. Wells' expert could not test the tire. The government didn't misbehave there. They did the best they could with what they had. What do you want? What I wanted was for them to tell Rich Kirtner that we're about to test your tire, because the defense was already represented at this time. They had asked the public defender's office to start representing Jim Wells so that they could do these kinds of things, so they could seize evidence, they could make sure he doesn't leave the island, et cetera. So what harm would it have done for them to have told Rich Kirtner, we're about to do some testing on the tire, if you want to have your own expert to observe it, we'll wait for that. That's what the government could have done. And in fact, the defense expert's affidavit indicated that's what's always done in a civil case. And the government hasn't explained why a case like this, where they want to place someone in prison for the rest of their life, shouldn't receive at least the same kind of treatment that would occur in a civil case. I see that I only have five minutes remaining, and I'd like to reserve it for rebuttal. Why did the government feel compelled to make a motion to remove the second? It's none of your business. Well, I think the government was just acting as a... It's none of your business, is it? Plainly, you have nothing to do with the appointment of counsel. I think the government thought under those circumstances that keeping a second team of attorneys after the government had decided not to pursue the death penalty was not a proper use of the CJA. It's not your business, is it? I understand your objection, Your Honor. Is it your business? I think the government thought that it had a role to play, that it had a role to play in determining that those funds weren't squandered. It seems unusual in my experience that this would be pursuant to a government motion. Is that a standard practice in your district, or is this a one-off? Well, this is a death penalty case, so I suspect that there aren't a lot of death penalty cases. But certainly the government had an obligation in a death penalty case to notify the magistrate judge that he had decided not to pursue it. I've tried a few death penalty cases where the government changes their mind. I have never had the government try and remove the second lawyer. Well, it is unusual for the government to spend a lot of effort and concern over this expenditure of CJA dollars. But I have a little different question. I think making that kind of motion actually puts the government in a position of, I think, ethical doubt. In other words, the government has a motive of decimating the defense team, doesn't it? I mean, it would make your case easier. I mean, suppose the defense had the right to say, you know, I'm going to make a motion that the government be limited to one AUSA, right? I mean, that's exactly what you're doing to them. Now, doesn't that present an ethical problem to you? I mean, that's more than just saving CJA dollars. Did the department ever consider that ethical conflict? I don't think there was an ethical conflict in this case, but let me make clear that. But don't you think that's the result, that you decimate the defense team? You cut it by at least 50 percent without any, you know, disparagement of Mr. Kirtner, but, you know, at least half. I understand the Court's concern, and I appreciate that in a future case it might be preferable just to notify the magistrate of the conversation. It's not just preferable. I mean, we are definitely 3-0 on how unusual and unprecedented that move was, so I take the government — I hope the government takes that seriously to heart. But I think that the big problem in your case is the 4-4B character evidence, so why don't you move to addressing that? Let me do that. I don't think the Court is not interested in hearing them, but I do just want to point out that the issue was raised multiple times before the trial began. But it was not decided until Dr. Malloy actually took the stand. And if you look at the defendant's excerpts of records at 746, you see that when defense counsel got up to object, it told the Court, I understand that the Court still has — is going to determine whether it's admissible. The admissibility of that testimony had not yet been decided. The substance of it was argued that we're unlikely to go on forfeiture in this case. So let's get to the substance. So let me get to the substance of it. The defense had two main themes. Number one, this is not the kind of guy who could have committed a brutal double murder like this. He's a nice guy. He has no history of violence. He has no criminal record. That was a central defense theme not prompted by the identification of Dr. Malloy. They opened on that theme. They cross-examined virtually every government witness who had worked with Mr. Wells. They then — they put on a substantial defense case they called witness after witness to say he's nonviolent. When he's been — when he's had issues at work, he hasn't exploded in rage. He was Santa Claus. He was a baseball coach. He's a nice guy, and he couldn't have done a thing like this. That was a central aspect of the defense. And under those circumstances, the government is — But this wasn't a rebuttal witness. This was a witness in the government's case in chief. But everybody knew this was coming. This was not — I have a problem with opening the door in the sense that, look, the government gave notice it was going to call the expert. The defense tried to exclude it and failed. What is the defense supposed to do but to try to mount a defense that counters the expected expert testimony that the government is going to present? I don't see how opening the door really fits. The evidence was not excluded. That's why I mentioned that the evidence was not excluded until Dr. Molloy actually was called. And before that, the defense had already opened on this theme. And they had cross-examined numerous government witnesses. There was no — Did the government open on Molloy's testimony? They mentioned that he would be testifying, yes. So the government thought it had been decided. You were expecting that Molloy's testimony would come in? That's not true. The government counsel asked the judge before she opened, you know, it's not clear that you've ruled on this, and I'd like to mention it in my opening. And he said go ahead and mention it. So she specifically sought permission to mention it because the issue had not yet been decided. And you can see this if you look at ER 746, the defense counsel gets up and says, you know, you haven't ruled on this yet, judge. You're going to determine whether it's admissible. It seems to me as even if I could see that a door was open, I don't think you had permission to drive a Sherman tank through with your 404 evidence. To me, you profiled, period. So I don't — Judge Walter, I do not think that the record supports that. And I think in order for the court to really decide this issue, you need to take a look at what the testimony actually was and not what defense counsel characterizes it to be. There's an exhibit in the record, Government Exhibit 10, which is a PowerPoint presentation that basically reviews what Dr. Molloy testified to, and you have to review Dr. Molloy's testimony as well. Defense counsel says that what we did was get up there and say, you know, the person who committed this crime has characteristics A, B, C, D, and E. And lo and behold, other people testified that he had those characteristics. Including a 10-year-old disobedience over intent. Well, let me just finish this, and then I'll talk about that. That did not happen. In fact, to the extent that Dr. Molloy testified about characteristics of people who could perform this kind of violence, they did not match up to Wells at all. And that is why the defense was the one who relied probably more than the government on his testimony in closing. To the extent that there were demographic characteristics, and that was not the thrust of the testimony. Dr. Molloy talked about how workplace homicides are rarely committed by coworkers, how two-thirds of people who commit multiple murders are psychotic, how often the people who commit these murders are in their fourth decade of life way too young for Mr. Wells, how typically they have a psychiatric history not true of Mr. Wells, how they are typically single or divorced, not true of Mr. Wells, and how 43 percent of them... You know, I really don't know what the point of that kind of testimony is, opinion testimony in a homicide case is, especially when there was absolutely no 403 balancing made at all by a trial judge, right? There was no 403 balancing because there was no 403 objection. If you go look at that place I'm citing, you will see that the only objection was relevance. And that's critical in the Ninth Circuit, because this Court has held that if you're objecting on the grounds of profiling, you need to specifically identify the ground that you're appealing on. You can't object on one ground and then appeal on another. So if you go look at where the objection was finally made when Dr. Malloy took the stand, it was a relevance objection. And you cannot fault the District Court for not doing a 403 balancing when the objection was relevance. So let me just talk about the HOT. This was a workplace homicide. The government's theory was that Mr. Wells murdered his two coworkers in cold blood as a result of an accumulation of grievances in the workplace. We cannot be expected to try a workplace homicide without putting on evidence of what was going on in the workplace. The HOT incident did occur earlier, but it showed a pattern. And in particular, it showed how Mr. Wells had gotten away with this kind of thing in the past, how he had been repeatedly doing these kinds of things. He had a new supervisor. Gotten away with this kind of thing? Gotten away with acts of disobedience towards his military supervisors. He had an arrogant attitude of his importance in the workplace that caused him in that instance to willfully disobey a specific order. Ten years before? Yes, but it was important to the history because it evolved. About two years before these murders, a new supervisor came in, Mr. Reckner, and Reckner had had enough. He read the employee file and he said, you're just not going to get away with this kind of thing. And that decision led to this accumulation of setbacks for Mr. Wells in the workplace. One after another, critical incidents in which he was found to be stealing firewood, accused of misusing a fuel card, was told he couldn't go to a conference that he wanted to attend. One after another, an accumulation of grievances that ultimately resulted in this very violent end. And the government, we cannot try a workplace homicide case without going into the defendant's history at the workplace and talking about how he related to his coworkers and how he related to his supervisors. Because that was the history of this case. The district court considered whether these incidents could come in and it found them admissible both because they were inextricably intertwined with the offense itself and because they were relevant to motive. And that's clearly correct. The motive for this offense arose out of frictions and grievances in the workplace. Explain to me again why Dr. Malloy's testimony is not prohibited classic profile evidence. Because what the government proffered was I'm going to call Dr. Malloy and we're going to basically have him describe the characteristics of individuals who commit such crimes. And he said that it was narcissistic and all that stuff. And then I'm going to call lay witnesses who basically talk about Mr. Wells having these characteristics. And that's the government says that the inquiry is going to be, does it fit, does it not fit? Isn't that classic profile evidence? That is not what happened. And I asked the court. Well, that's why I'm quoting the government because the government's proffer to the district court as to why Dr. Malloy's testimony would be relevant when paired with lay witnesses' testimony is does it fit, does it not fit? Yes, but you have to look at what the it is that fits. And the defense seen that we identified a number of specific characteristics and said he has all of those characteristics is not true. One of the reasons we introduced this evidence is to rebut the claim that people who commit these kinds of crimes snap. That they just in a fit of rage murder their coworkers because a certain incident has caused them to snap. And what the government was talking about when it talked about... Rebut evidence? What evidence at the time? What evidence did that rebut? It rebutted Wells' claim that if he had been this kind of person, he would have had angry outbursts. When we would put... Yes, but people had already been cross-examined on this. We would put on evidence that he had a conflict in the workplace. And then Wells would cross-examine a witness and say, okay, I had a conflict in the workplace. But did I blow up? Did I explode in rage? And one of the critical aspects of this testimony was to show that a minority, not all, but a minority of people who commit these kinds of targeted multiple homicides engage in significant planning and premeditation. And that they do not, they are not snappers. They let an accumulated grievance result in planning and premeditation. And they do not, 80% of them do not provide any evidence that it's going to happen in advance. And so that that we're responding to there is not some demographic characteristics. It's the idea of planning and premeditation. The suggestion that we presented a profile and said, oh, he fits, is a misrepresentation of the record. And I would urge the Court to look at Government Exhibit 10 and to read Dr. Malloy's testimony so you can get a sense of what he actually testified to and what the basis of it was. It was not an effort to identify demographic characteristics. And as I said earlier, to the extent that it was, it overwhelmingly favored the defense. Instead, it was an effort to talk about how some multiple murders are the result not of an emotional reaction, but of targeted or intended violence, that is, the result of considerable planning and premeditation. And it was also a discussion of the pathway to violence. It was sought to explain to the jury, the jury could reasonably ask themselves, how could anyone do a thing like this? And particularly in light of Mr. Wells' defense, this chief defense that he was not the kind of person who could do something like this. Dr. Malloy talked about the pathway to violence. He talked about how an accumulation of small grievances that to an ordinary person wouldn't seem sufficient to trigger something like this, can accumulate to the point where somebody who has narcissistic tendencies would allow it to formulate into a plan that then resulted in premeditation, in significant planning. So I don't think that the testimony has been accurately characterized. And I think if you read it, you will see that it related to two modes of violence, and to the significance of targeted and intended violence, and to the description of the pathway to violence that an ordinary juror might not have understood. I get it. Let me address something else that disturbed me greatly in this, and that was the question about did she blurt out a name? Yes, Wells, and then the argument goes on. There was another part to that that said Jim wouldn't hurt Rich. If the government had disclosed that entirety, it was not relevant. It's only relevant as an accusation by the widow. Judge Walter, that is not true. It was actually relevant to both defense themes. There were two defense themes, right? He's not the kind of guy who does something like this, and it was relevant to show that other people in the workplace were aware of the conflicts. But the other theme was that the government's investigation had had tunnel vision. If you look at the defense closing, you'll see that word tunnel vision probably 30 times. So there were two themes. He's not that kind of guy, and tunnel vision. What's the relevance of did she blurt out a name? Well, what happened was she was asked who could have done this, and she identified Wells. That's relevant both to what was going on in the workplace and to this idea that the government had engaged in tunnel vision. The question was, and so when we walked in in uniform, question, interruption, question, did she blurt out a name? Yes. What was that name, Jim Wells? Yes, Your Honor. I recognize that the way it came out was potentially misleading, but it was ultimately corrected. How was it ultimately corrected? Because the defense put in the whole thing. A transcript came in? Yes. What, two days later? I don't think it was two days later. I think it was the next day. Okay, a day later. But the whole thing came in. And to the extent that this harmed anyone, I suspect it was not very helpful to the government. I guess what was the point in asking the question to begin with? That's what I'm saying. The fact that when asked who could have done this, she identified Mr. Wells was relevant. She wasn't asked that. She was hysterical and she blurted out a name. I don't see where. In fact, what happened was she was asked, after a period of hysteria, she was asked, do you know who could have done this? And she identified Jim Wells. Who do you think could have done this? What was her reaction is the question that prompted the whole thing. Who do you think could have done this or do you know who might have done this? But then she immediately says Jim wouldn't hurt Rich. Yes, and that came out. That was disclosed to the jury. So if the government was playing fair, what was the point? The point went to both of the two defense theories. First of all, it rebutted the idea that the government inappropriately focused too soon on Jim Wells. The defense said that his supervisor, Reckner, identified him as a suspect at the very beginning and the government's investigation inappropriately. I'm looking and I can't pinpoint it just now, but my recollection is that she wasn't asked who could have done this and then she blurred out Jim Wells. It was who did he have a conflict at work with? And then she said Jim Wells, but he wouldn't hurt a fly. I can't pinpoint it, but my recollection sitting here differs from that representation. So I want to give you a chance, if you have that handy, to clarify the record. Okay, so the question was has he had any problems with anybody? Right, so it wasn't who could have done this. That's quite different. So did the government attempt to mislead the jury by asking the question in that way? I think the way the question was posed and the way the answer came out was potentially misleading. But that was not ñ Not potentially misleading. Given the record that we've now just clarified, it was misleading, and certainly in instances where it was misleading, I think the government needs to concede that so we don't waste too much time on it. Let me, if the Court has questions about anything else, let me just move on, then we concede that. If the Court's interested in hearing about the sufficiency of the evidence, we do believe that the evidence was absolutely compelling. My time is running out, so let me just talk about ñ I did address with counsel the question of whether it's harmless error, and she pointed out rightly that the government really does not focus on that in its briefing. Well, we believe that the plain error standard applies, and we said that the plain error standard applies, and under plain error, it's the defendant's burden to prove prejudice. So we've argued plain error, and we're talking about the expert testimony issue. It's the defendant's burden to prove prejudice, and for various reasons that we've identified in our brief, there is no prejudice. To the extent that this was profiling, it was overwhelmingly helpful to the defense. And to the extent that it was something else, it was clearly in response to one of the main defense themes about how Jim Wells was a nice guy and couldn't have done a thing like this. So under the plain error test, prongs three and four, we believe that this evidence ñ that the defense cannot prove that this evidence was harmful. And if it's not plain error review because it was preserved below? Well, then the harmless error standard applies, but we believe that it's harmless for the same reasons. And I do think if you take a look at the evidence, that it was absolutely overwhelming. He was in the vicinity of this crime for 34 minutes, and with respect to the tire issue, which is a minor issue, he had no alibi. There was a videotape that showed that he headed north at 648 and did not come back until 722. And on the second day after the murder, he's confronted with this. He said, look, well, you said you went home with this nail in your tire. You're in the vicinity for 34 minutes. And he pauses for 15 seconds, and then he says, I have no reasonable explanation for that. There was never any reasonable explanation offered. If you read the defense closing, very eloquent, goes on for three hours. They never provide any explanation of what he is doing in the vicinity of the crime for 34 minutes. And on top of that, there was substantial evidence that he created a false alibi, that he had access to the gun, that he was the only person who had the motive to do this, and that the crime was undoubtedly an inside job done by somebody who understood how this building worked, basically came into the building in an extremely short period of time, executed two people, and left. And on top of that, there's the videotape of the blue car. We know he had access to a car. The blue car in the videotape, and I suggest that the Court take a look at it, closely matched the car of his wife, and you see it arriving minutes before the murder and leaving minutes afterwards. Thank you very much. If the Court has any specific questions, I'll answer them. Otherwise, I just have some references to the record. On this issue of whether or not the defendant opened the door because he cross-examined witnesses, the government explained repeatedly, pre-trial, that the way this would work would be they would put on the witnesses, and then they would put on the lawyer. So they put on the witnesses, and the witnesses were allowed to say things like this 10-year-old incident showed that he was a narcissist, et cetera, and the defendant cross-examined those witnesses. That is not opening the door. Cross-examining the government's witnesses that are proffered to show a character is not opening the door. The government asks you to read Malloy's testimony, and I ask you to read Malloy's testimony too, because if you do, what you'll see is that he said that this crime would be committed by a male, a narcissist, with an inflated view of self, grandiose, strong sense of entitlement, self-focused, lacking empathy. And the government argued that this was a match. And finally, as to harmlessness, if one juror relied on the testimony that the jury emphasized, that the government emphasized as the central piece of evidence in its case, then the error was not harmless. This trial was riddled with error. All of the convictions should be reversed. I think the hook for the government's opening the door argument is that the district court had not ruled, and so that question was still open, and the AUSA had to still ask for permission to mention it in opening. I mean, we're going to go back and look at the record on that again, but I thought that by the time the parties opened that that was a done deal that Dr. Malloy was going to testify. No, go ahead. It wasn't a done deal until opening. So the court said, unless you convince me otherwise, I think this is coming in, but I'll look at it again. He said, I'll look at it again before the parties open? Yes. And so the court asked the government to proffer to the court what this testimony would be. So the government proffered to the court what the testimony would be, and it was the personality and psychological characteristics of someone who would commit this kind of crime. And then before opening, the government said, I'd like to mention Malloy in my opening. I thought that was not decided yet, and the judge said, I thought I had already decided that. But okay, go ahead and do it. So clearly the court believed it had already been decided. The fact that the parties kept asking the court repeatedly, has this been decided, doesn't mean that the court hadn't decided it. And in fact, every time they asked the court, the court would say, yes, that's already decided, and you have a continuing objection and sit down. You have a response to the government's position that the district court had no obligation to do a 403 balancing because no such objection was made by the defense. I think that's the government's position. I think the court always has an obligation to do a 403 balancing, and in this particular case, it was presented by the defense. It was clearly mentioned in the motions in limine that this would be highly prejudicial character testimony. So to the fact that the defendant may not have said 403, we don't know, because the transcript is garbled at that point. It doesn't relieve the district court from controlling his courtroom. Even if it were on plain error review, this was not probative at all. 403 is a probative value substantially outweighed by the prejudice. This was not probative at all. So the court never even really needed to reach whether it was prejudicial, but if it had, it certainly would have found that it was. All right. Thank you very much to both sides for your arguments in this case.
judges: Tashima, Nguyen, Walter